# THE NATIONAL BANK OF BALTIMORE

## *vs.*

## HARRY B. ROCKHOLD.

*Certification of Check—Procurement by Fraud—Evidence.*

In an action against a bank on its certification of a check which had been given by the drawer, while in financial difficulties, to the plaintiff, one of his employees, in part payment of an indebtedness to him of many years standing, *held* that the fact that, when such drawer desired to make this payment, plaintiff accepted it and procured the certification of the check given, considered in connection with all the facts and circumstances of the case, did not show fraud on plaintiff's part in receiving the check and procuring its certification.

*Decided June 23rd, 1922.*

Appeal from the Superior Court of Baltimore City (STANTON, J.).

Action by Harry B. Rockhold against the National Bank of Baltimore on the certification of a check. From a judgment for plaintiff, defendant appeals. Affirmed.

The cause was argued before BOYD, C. J., THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*John Hinkley,* for the appellant.

*Randolph Barton, Jr.,* and *Malcolm H. Lauchheimer,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

The appeal in this case is from a judgment recovered by Harry B. Rockhold, the appellee, against the National Bank of Baltimore.

The plaintiff was buyer for Harry T. Anderson, who had for years conducted a retail shoe business in the City of Baltimore, largely by means of mail orders, using the trade names of The Patapsco Shoe Company and The Anderson Shoe Company. The business was not incorporated, nor was it a partnership, but was the sole property of Anderson.

In the fall of 1920, Anderson had quite a large stock of goods on hand, the value of which had greatly depreciated, and his business in that year was far less than it was in the preceding year; and like many others at that time, Anderson was hard pressed in his financial affairs and, in one or more instances, he had asked and obtained the indulgence of some of his creditors in the extension of the time of payment of the amounts owing to them.

On the 15th or 16th day of November, Simon Dalsheimer, president of the Lord Baltimore Press, a company engaged in the printing business in the City of Baltimore and one of Anderson's largest creditors, called upon him for a statement showing his financial condition. This was made and sent by him on the 23rd day of November, but, before sending it, he gave to Rockhold, who for more than twenty years had been in his service, and to whom he at that time owed $11,360, a check for the sum of $3,070 in payment of a private indebtedness to him forming a part of the said sum of $11,360, which had been standing for a number of years. The check of $3,070 was drawn to the order of himself and, by his endorsement thereon, was made payable to the plaintiff. In Anderson's statement to the Lord Baltimore Press Company, the amount stated to be on deposit in the defendant bank was the amount that would be remaining therein after the payment of the check of $3,070.

The plaintiff, in the afternoon of the 23rd of November, took the check to the defendant bank, reaching there a little while after the hour at which the bank closed for business, but he nevertheless obtained a certification of the check from an official of the bank. After procuring the certification of the check, the defendant went to the National Exchange Bank, where he deposited it to his credit. On the following day, Anderson committed suicide, and when the certified check was, in due course, presented to the defendant bank, it refused payment thereon.

On the 27th day of December of the same year, suit was instituted by the plaintiff to recover the amount of the certified check.

The declaration contained six of the common money counts and one special count, and with it was filed the said check or a copy of it.

The pleas filed thereto were: (1) never indebted, as alleged; (2) never promised, as alleged; (3) that the certification of the check was procured by the fraud of the plaintiff; and (4) alleging the insolvency of Anderson and the knowledge of it, by both him and the plaintiff, at the time the check was given, though unknown to the defendant; the employment of the plaintiff by Anderson and the latter's indebtedness to the defendant in the sum of $50,000, evidenced by ten notes, each for the sum of $5,000, the first falling due on November the 29th, 1920, and the last on March the 16th, 1921, and the others between those dates; that Anderson had on deposit with it at the time $17,555.94, which, as it alleged, was subject by reason of Anderson's insolvency to a "banker's lien" thereon, for the payment of said promissory notes; that the check was obtained by the plaintiff from Anderson before the maturity of the alleged debt from Anderson to the plaintiff, pursuant to the common purpose and intent of said Anderson and the plaintiff to defraud the defendant and to that extent defeat its "banker's lien," upon the funds on deposit to Anderson's credit; that after the alleged certifi-

cation of the said check and before its presentation for payment through the Baltimore. clearing house, on November the 24th, 1920, Anderson killed himself, and his insolvency thereupon, on that day, became known to the defendant and his other creditors, whereupon the defendant exercised its right of holding the said sum of Anderson on deposit under its "banker's lien," crediting the same in part payment of his indebtedness to the bank; that thereafter on November the 26th, 1920 (the intervening day, November the 25th, being Thanksgiving Day and a legal holiday), the check was presented through the Baltimore clearing house for payment for account of the plaintiff, and its payment was refused by the bank in the exercise of its "banker's. lien."

The plaintiff joined issue on the first and second and demurred to the third and fourth pleas. The demurrer to the third was overruled, but it was sustained as to the fourth, and, upon the. issues thereafter joined, the case was tried. At the trial, three bills of exceptions were taken, two to the rulings of the court upon evidence offered, and one to the action of the court on the prayers.

Of the three prayers offered by the plaintiff, the second was withdrawn and the first and third were granted. The defendant offered but one prayer and that was rejected. The jury were instructed by the plaintiff's third prayer that there was no evidence in the case legally sufficient to prove that the certification of the check sued on was procured by the fraud of the plaintiff. By his first prayer, the jury were told that "inasmuch as the defendant bank admits the certification by it of the check for $3,070, the subsequent presentation of said check for payment and its refusal to pay said check, and that it has not paid said-check or any part thereof, plaintiff is entitled to a verdict for the amount of said check with interest from the day of its presentation to defendant for payment, to wit, November the 26th, 1920.

By the defendant's prayer, the court was asked to instruct the jury that, if they found certain facts, those mentioned in

defendant's fourth plea, they should find that the certification was fraudulently obtained, and their verdict should be for the defendant.

As stated by the appellant in his brief, the action of the court upon the demurrer to the fourth plea, and its rulings on the prayers, present practically the same question, and that question is, was the bank, upon the facts of the case, justified in refusing payment of the certified check given by Anderson to the plaintiff, on the ground that the holder thereof obtained the certificate by fraud? And it is contended by the plaintiff that the evidence disclosed by the record shows that the certificate was procured by the fraud of the plaintiff, or at least was legally sufficient to go to the jury as tending to show such fraud.

There can, we think, be no question as to the correctness of the proposition that if the certification was procured by the fraud of the plaintiff and the check remained his property and did not pass to an innocent holder, the certification was not binding upon the defendant bank, and it could rightfully disregard the certification and refuse payment of the check. *Daniel, Negotiable Instruments* (4th ed.), sec. 1608; *Second National Bank of Baltimore* v. *Western National Bank of Baltimore,* 51 Md. 128. But if, on the other hand, the facts contained in the record fail to show any fraud on the part of the plaintiff in the procurement of the certification, the bank cannot escape the binding effect of the certification and avoid the payment of the check. *National Exchange Bank* v. *Ginn & Co.,* 114 Md. 181. It will thus be necessary for us to examine the record and determine whether the facts, thereby disclosed, reveal any fraud on the part of the plaintiff in the procurement of the certification, or at least whether it reveals facts legally sufficient to go to the jury as tending to show such fraud.

It is shown by the uncontradicted evidence, offered by the defendant, that at the time the check for $3,070 was given by Anderson to the plaintiff, Anderson was owing to the

plaintiff $11,360; that the check was given in payment of
$3,000 of said sum, with interest, which was owing to the
plaintiff by Anderson, in his individual capacity, and which
the plaintiff had ten or fifteen years before loaned to Ander-
son, and which he, Anderson, had loaned to or used in his
business, charging it a larger interest therefor than that
which he paid the plaintiff.

The loan of $3,000, it appears, was treated by him more
as in the nature of a private obligation, while the balance
of his indebtedness to the plaintiff, that remained unpaid,
was regarded by him as an obligation arising out of or in
connection with the business conducted by him; and the
evidence so offered by the defendant also showed the certifi-
cation of the check.   At the time the check was certified,
Anderson was owing to the bank $50,000, but none of it at
that time was due, and Anderson had on deposit in the bank
the sum of $15,524.37.

William Rennie, who was in the employment of Anderson
as manager, when produced as a witness for the defendant,
testified that the call from Dalsheimer for a statement was
received about a week prior to November the 23rd, and
was the result of a request from Anderson for further exten-
sion of time in which to pay certain monies owing to
Dalsheimer's company.   He was told by Anderson that the
statement requested would be sent to him on the 23rd of
November.   When the request was received, Rennie's atten-
tion was called thereto, and he was requested to make out the
statement, which he did, under the instruction of Anderson,
from the records and books of the office, and it was sent to
Dalsheimer, as promised, on the 23rd day of November, and,
so far as the books showed, it was a correct statement.

When asked about the check, the witness stated that early
in the morning of the 22nd, Mr. Anderson told him to make
out said check and, late in the afternoon of that day, he
had Mrs. Abbott, the bookkeeper, do so, and the following
morning he turned the check over to Anderson.

The witness, when asked for what purpose the check was given to Mr. Rockhold, replied, "Mr. Anderson told me that he owed Mr. Rockhold $3,000 and wanted to pay him. Q. When, on the evening of the 22nd? A. Yes, sir; he wanted to pay him and have the check drawn for $3,000 and add the interest from July the 1st, 1920." Interest upon the amount had been paid up to that time. The interest amounted to $70, and that was added to the amount of the indebtedness in making out the check. The check was made payable to Anderson and was in that condition when handed to him. Anderson afterwards endorsed thereon "Pay to H. B. Rockhold," signed "Harry T. Anderson." The endorsement was in Anderson's handwriting.

Rennie further stated that Rockhold never saw the statement before it was sent to Dalsheimer, and did not know what it contained, and in answer to the inquiry, "Did he (Anderson) have any creditors pushing him in any way?" He replied, "No, sir." And it was his opinion that had the extension been granted him, Anderson "could have pulled out of the difficulties by selling his shoes."

Witness was then asked, "Did Mr. Rockhold have anything to do with Mr. Anderson's financial affairs at all? A. No, sir; he did not come in contact with that end of the business. He had nothing to do with the books, he knew nothing at all about that end of the business."

Rennie further testified that Anderson called him in his office on the afternoon of the 23rd and told him that he had given Mr. Rockhold his check and that he had gone up town to cash it. "I told him it was two o'clock now and rather late and Mr. Anderson remarked he had forgotten all about banks closing at two o'clock." There was at the time nothing said about getting the check certified.

Rockhold, when placed upon the stand by the defendant, testified that he received the check for $3,070 from Mr. Anderson on the 23rd day of November, and when asked why Mr. Anderson gave him the check, said, "He called me in his

office after we had been up to lunch and he said, 'Mr. Rock-
hold, that $3,000 I have owed you so long, I would like to
pay it.' I said, 'All right.' He said, 'Can you get it cashed
down at the National Bank of Baltimore,' and I said, 'I think
so; * * * I do not want the money, however, but I can get it
certified'; 'All right, he said, if I were you I would go down
and have it certified.'" This was said to him about 1.30
o'clock in the afternoon; that he had no knowledge whatever
before that time that Anderson intended to pay him the
$3,000 on that day, and when asked what it represented, he
said, "A loan that I had loaned him for years. Q. You
never made any demand for it? A. I did not ask him for
it, no, sir, I never mentioned it to him."

He further testified that the indebtedness of $3,000 was
in the form of a note that matured on December the 30th,
1920, one month and seven days after its payment by said
check; that the interest on that note had been paid up to
June 30th, 1920, and that the debt itself had been standing for
ten or fifteen years. He was then asked, "Were you not sur-
prised when Mr. Anderson wanted to pay you the $3,000?"
And his answer was, "Mr. Anderson said that the $3,000 I
owe you does not appear on the statement I am sending to
Mr. Dalsheimer this afternoon and I want to pay it. Q.
Did it not seem to you to be strange to pay that $3,000 at
that particular time? A. No, sir; he said it did not appear
on there. Mr. Anderson had carried it as a private loan
and I thought that was all right."

He further testified that he knew that a statement had been
asked for by Mr. Dalsheimer and one had been sent him on
that day, but he did not see the statement, and when again
asked, "What is your explanation of receiving this money
from Anderson, when he was asking an extension from Mr.
Dalsheimer, his principal creditor," he replied saying "that
Anderson had carried this as a private loan; I suppose he
wanted to get it out of the way because it did not show on
the statement." He had no other explanation to make; that

he knew that business was dull and that Anderson had a big stock of shoes on hand, which were carried at cost and upon which, in his opinion, the depreciation in value was about twenty-five per cent.; that he knew in a general way that the business did not compare favorably with the previous year, "but I did not have the figures."

Upon cross-examination, Rockhold testified that he thought Anderson expected to obtain an extension of time; that he certainly thought so; that he knew nothing about the books; had not seen them for a year and a half. He also testified that he knew nothing about the state of Mr. Anderson's account in the National Bank of Baltimore; he did not know the balance he had there, nor did he know how much money he owed, and knew nothing "of what the paper spoke of in regard to this lien, banker's lien"; that Anderson owed him other monies, $11,360 in all; upon this "I got my dividend as the other creditors"; that he observed nothing in the manner, demeanor or behavior of Mr. Anderson to cause him to believe that he was "disturbed or upset" at the time; that he was an excitable man but he saw no difference in his conduct on that and other occasions; that his relations with him were friendly. They lunched together on November the 23rd. He met him on the street on the morning of the 24th and asked where he was going and he said up town, would be back about 10 or 10.30 o'clock; he never saw him alive after that; that he was of the impression that had the creditors granted the extension, there would have been no trouble in getting the money out of the shoes and paying the indebtedness; that "there was no trouble outside of one or two small creditors for shoes that were in dispute"; the endorsement upon the back was written by Mr. Anderson; that when he called him in the office, "he took this check out of his desk; he had it in a drawer in the desk and he said, 'I had this check made payable to me, but I will endorse it to you'"; the endorsement was upon it when he handed it to him.

The statement, which is quite a long one, furnished by Anderson to Dalsheimer, appears in the record, but, for the purpose of this case, we do not think it necessary to insert it in this opinion. By it, however, Anderson was not shown to have been insolvent. In the statement there were two items, one for merchandise on hand, $151,698.04, and the other the mailing list, $155,268.00, upon which the executor, in the sale of them, failed to realize the amounts at which they were valued in the statement. The merchandise was not sold in the regular course of business, but was sold at what could be obtained for it. From the mailing list, the value of which was ascertained by what it had cost Anderson, to whom no doubt it was more valuable than to others, the executors received only a few thousand dollars. As a result thereof, the estate proved to be largely insolvent, but whatever may be said of this statement as to what it indicated in respect to the solvency or insolvency of Anderson, it was never seen by, nor were the contents of it known to, Rockhold. He knew that a statement had been asked for and, as he stated, he thought the extension asked for would be granted, and had the time of the payment of Anderson's indebtedness been extended by the creditors, it was his opinion that Anderson could have extricated himself from his financial difficulties.

It is not necessary for us to consider the wrong doing, if any, of Anderson in connection with the certification of the check, as we find in the record no evidence of any probative force or weight, legally sufficient to go to the jury, tending to show any connection of the plaintiff in the alleged wrong doing of Anderson, or any fraud on his part in the procurement of the certification of the check. Anderson was owing Rockhold a large sum of money and wished to pay him a little more than twenty-five per cent. of that indebtedness, which had been standing for many years. Rockhold had not called on Anderson for it, but it was Anderson's wish to pay it, giving his reasons therefor, which were not of a character

to lead the plaintiff to think that Anderson, in so doing, was attempting to defraud the bank, or was wrongfully attempting to deprive it of any of its rights, or was in any way committing a wrong in which the plaintiff should not have participated.

The uncontradicted evidence in this case shows that Anderson was largely indebted to the plaintiff, and it was his wish to pay to him a part of such debt. When that wish was made known to the plaintiff, he agreed to accept it.

In this act of the plaintiff, considered in connection with all the facts and circumstances of the case, we find no wrong committed by him in the receipt of the check and the procurement of the certificate thereon.

As we find no reversible errors in the court below, the judgment will be affirmed.

*Judgment affirmed, with costs to the appellee.*